[Civ. No. 40240. First Dist., Div. Four. Nov. 1, 1977.]

DONALD WIDENER, Plaintiff, Cross-defendant and Appellant, v.
PACIFIC GAS AND ELECTRIC COMPANY et al., Defendants,
Cross-complainants and Appellants.

416

418

**COUNSEL**

Garry, Dreyfus, McTernan, Brotsky, Herndon & Pesonen, David E. Pesonen and Laurence H. Eldredge for Plaintiff, Cross-defendant and Appellant.

Charles T. Van Deusen, Arthur L. Hillman, Jr., F. Ronald Laupheimer, John E. Carne, and Crosby, Heafey, Roach & May for Defendants, Cross-complainants and Appellants.

## OPINION

**CHRISTIAN, J.**—Donald Widener (hereinafter appellant) appeals from a judgment notwithstanding the verdict and from an order granting a new trial after a jury had awarded him damages on his complaint for libel against Pacific Gas and Electric Company (PG&E) and its employee, James C. Carroll (hereinafter respondents). The verdict against PG&E was in the amount of $750,000 compensatory damages and $7 million in punitive damages and against Carroll in the amount of $8,000 punitive damages. The jury also found in favor of Widener on a cross-complaint by Carroll.

The trial court rendered a combined "Order for Judgment Notwithstanding the Verdict, Order Conditionally Granting New Trial, and Order Granting New Trial on Cross-complaint." In its order, the trial court stated that the judgment n.o.v. was granted on the ground that appellant had failed to produce any evidence of "actual malice" as required under *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412] and that the evidence was thus insufficient to support a verdict in favor of the plaintiff. The trial court also stated that "In the event that, for any reason, the aforesaid order for judgment notwithstanding the verdict is reversed on appeal then the motion of defendants James C. Carroll and Pacific Gas and Electric Company, a corporation, for a new trial is hereby granted . . . ." The trial court specified, as the reason for its "Order Conditionally Granting new Trial," the same reason that it had given for granting a judgment n.o.v.—that plaintiff had failed to produce clear and convincing evidence of actual malice. The trial court also conditionally granted the defendants a new trial on the basis that the damages awarded by the jury were excessive. The trial court also granted defendant Carroll a new trial on his cross-complaint.

Widener appeals from the judgment notwithstanding the verdict and from the alternate order granting a new trial. Defendants PG&E and Carroll have taken a protective cross-appeal from the judgment entered on the jury's verdict in favor of plaintiff.

This libel action concerns a certain letter, written by respondent James C. Carroll, a supervising steam generation engineer employed by respondent Pacific Gas & Electric. The letter, dated July 13, 1971, was

reviewed and revised several times by Carroll's superiors at PG&E, and was sent to Robert Howard, vice president of NBC and station manager of KNBC-TV in Los Angeles. In the letter, Carroll attacked the content of "Powers That Be," a nuclear power documentary produced by KNBC, and charged appellant Donald Widener, the producer of the documentary, with a gross breach of journalistic ethics—secretly taping a preinterview discussion with Carroll, concerning the problem of faulty fuel rods, and splicing that discussion into the final film.

Appellant Widener was employed by KNBC as a documentary producer. Widener had received professional recognition for previous documentaries made for KNBC, and in 1971, had a one-year exclusive contract with NBC to produce three documentaries. One of these films, "Powers That Be," concerned the subject of nuclear power as a source of electrical energy. The research, writing, interviewing, and editing of the film were done by appellant pursuant to his contract with KNBC. "Powers That Be" was narrated by the well-known film personality, Jack Lemmon, and was broadcast in prime evening time over KNBC in Los Angeles on May 17, 1971. The point of view of the film was essentially anti-nuclear.

During the preparation of "Powers That Be," appellant filmed an interview with respondent James C. Carroll. The filming occurred in the control room of Humboldt Unit No. 3, a nuclear power plant operated by PG&E near the City of Eureka. The interview had been arranged by the public relations department of PG&E.

Respondent Carroll was aware that he was being filmed, and that his voice was being recorded on the NBC equipment, during the formal interview. During the filming, Carroll was seated facing Widener under bright lights especially set up for the interview. A member of the NBC camera crew fastened a sensitive Laveliere microphone on a cord around Carroll's neck. The filmed questioning was preceded by the sharp report of a clapboard held in front of Carroll's face. The entire filmed interview with Carroll was approximately four minutes in length. A one-minute segment was used in the finished film. The film as broadcast lasts approximately 50 minutes.

Carroll did not see the KNBC broadcast of the film; he first learned of the broadcast from an acquaintance. Carroll was informed that he

appeared "unable or not willing to answer a question that had been given to [him]."

On May 26, about a week after the broadcast, Frederick R. ("Fritz") Draeger, PG&E's "nuclear information specialist" and the employee who had made the arrangements for Widener's visit to the Humboldt Bay power plant, sent a memorandum to three of his superiors in the public relations department. The May 26th memo, which was sent to Larry R. McDonnell, head of the PG&E News Bureau, A. J. McCollum, head of public information, and Robert R. Gros, vice president of public relations, reported that a few of Draeger's friends who had seen the film "reacted violently" and that some friends of Dale Cook, western states public relations officer for the United States Atomic Energy Commission, "tagged the documentary as 'smooth, professional and devastating.'" The May 26 memo states in full as follows:

"LRM/AJM/RRG:

"'Powers that Be' was shown on KNBC Tuesday, May 18, 1971. A few of my friends saw it and reacted violently. I understand Jack Horton was concerned and has Bill Walker trying to develop a rebuttal program. From all I heard, we should go in and ask for equal time to respond to a hatchet job. Dale Cook reports that his friends tagged the documentary as 'smooth, professional and devastating.'

"From all I could glean as relates to our work at the Humboldt Bay Power Plant, Jim Adams wound up on the cutting room floor and J. Carroll's footage was so placed as to give the worst possible impression.

"KNBC plans to repeat the documentary in a few months. In six to nine months they will put it in the studio's circulating library. The film is currently being offered to affiliate stations.

"Dale Cook has promised to send me a review of it which appeared in the Los Angeles TIMES. The review is negative from our point of view.

"Widener's contract has not been renewed by KNBC so he is going independent. Thus, I have had difficulties in trying to get more information. At present there is only an original of the documentary and the studio refuses to let it out. However, to assuage my feelings, a

transcript is being mailed to me today. It will be reproduced here and given broad circulation.

FRD

"P.S. - Just received transcript in mail—attached.

E. A. Boone

"JCCarroll
cc:  JRAdams"

A copy of the memo was also sent to Carroll.

Sometime soon after May 26, Carroll asked Draeger to seek a copy of the film for review. Draeger had already requested the film on his own. KNBC declined to release its only copy but, as Draeger had reported in his May 26 memorandum, "to assuage my feelings, a transcript is being mailed to me today. It will be reproduced here and given broad circulation."

Draeger promptly circulated the transcript to "appropriate people in the company who might have an interest," but not to Carroll. Carroll finally received a copy of the film transcript about a month later, on June 25. Upon reading it, Carroll became "upset" and "quite angry" at being portrayed as evasive. Carroll believed that the transcript erroneously and unfairly portrayed him as unwilling to answer a question concerning fuel cladding.* The film transcript read, in part, as follows:

"(JACK LEMMON): This reactor in northern California has been operating since the 1950s. But not without criticism. Such as faulty fuel rods, a problem since corrected. We asked P.G. and E.'s James C. Carroll about such criticisms.

"(DON WIDENER): Mr. Carroll, as you know, there have been published criticisms of the plant here for using improper construction materials in the beginning. Can you describe what that's all about?

"(JAMES C. CARROLL): Well this is analogous to a problem you have in your industry. There were criticisms of improper design and construction

---

*Cladding is the metallic shielding around the radioactive fuel elements of a nuclear power plant. Where cracks develop in the fuel cladding material, radiation leaks into the environment.

techniques in early color television sets that resulted in excessive radiation to people.

"(DON WIDENER): What was it exactly that the critics were talking about in your case?

"(JAMES C. CARROLL): I don't think we ought to answer that, it's too lengthy a question.[1]

"(JACK LEMMON): Long questions. Sometimes short answers. It's tough to get a matched set. The questions about nuclear power involve radiation, long-lasting wastes, and the possibility of a major accident. Long questions, indeed."

Carroll's memory was somewhat cloudy as to whether he had said the words shown in the transcript during the filming. In his testimony, Carroll did recall responding to Widener in a low voice during the filming, but "it was a mystery . . . how my . . . low voiced conversation could have ended up in the program." The following exchange occurred at trial:

---

[1]The "out-takes" show that the following occurred immediately after the exchange used in the finished film:

"D. WIDENER: I didn't. I didn't, never did hear what he said. What did you say? I never did hear that last part.

"J. CARROLL: It's too lengthy a question, I think, to answer.

"D. WIDENER: Oh, okay.

"J. CARROLL: Do you want me to spend the ten minutes answering it right? I don't care. I will.

"D. WIDENER: No, we won't—we don't have ten minutes and if you—

[Third voice]: "Cut—

"D. WIDENER: can't answer it in ten minutes, then—

[Film ends, sound continues] [Blurred film]

"D. WIDENER: —it can't be done."

Carroll believed that Widener's editing of the finished film unfairly portrayed him as evasive on the fuel cladding issue, since, as the "out-takes" show, Carroll had offered to answer Widener's question about "improper construction materials" during the formal interview if he could take ten minutes to respond. It was Widener's position that the answer used in the film fairly captured what Widener perceived as Carroll's evasive attitude: The fuel cladding or improper construction material issue was discussed preliminarily when the film crew arrived, and Carroll repeatedly stressed the need for "five to ten minutes to discuss it." At that time, Widener informed Carroll that he could not give Carroll 10 minutes because it was only a 50-minute film. Also during this preliminary discussion, Carroll "offered the opinion that [he] did not see how fuel cladding problems were really of much public interest" in view of the fact that "Humboldt Bay, as well as all other U.S. commercial power reactors, had always operated well below A.E.C. limits for both gaseous and liquid radioactive waste discharges."

"The Court: But at the time that you were writing this [letter] or reflecting on it at your home one evening, your recollection is that something that you had said had either been dubbed out or something that you had said at a prior time had been put in. Is that what you—what did you conclude preliminarily?

"The Witness: Well, there were two things that troubled me. One is my recollection of my response to that question was that it had been held in a low voice. And I could not understand how it could have ended up in the program.

"The Court: Is this at the actual filming?

"The Witness: At the actual filming.

"The Court: And you couldn't understand what?

"The Witness: How that could have ended up in the program because of the high background noise in the control room and the rest of it.

"The Court: What ended up in the program, these words that I've just read?

"The Witness: Yes.

"The Court: 'I don't think we ought to answer that. It's too lengthy a question'?

"The Witness: Well, not those specific words, but words in response to that question. Because I recalled and my memo shows this, that when the question was asked I didn't know how to respond to it, and I dropped my voice to try to get Mr. Widener's attention."

Carroll testified that at the time he reviewed the film transcript and drafted the accusatory letter, he was certain that Widener had unfairly created the impression that Carroll had not wanted to answer the fuel cladding question; but his recollection was not clear as to specifically what he had said during the filmed interview.

Concluding that the answers that he had given during the Humboldt Bay interview had been misrepresented, Carroll decided to write a letter of complaint to KNBC-TV. Carroll submitted a draft of a letter to Fritz

Draeger on June 30. A week later, Fritz Draeger submitted the draft, with his own minor changes, to his superiors in the public relations department and to P. A. Crane in the law department for their review. The draft letter was submitted by Draeger to his two superiors with the following cover memorandum, dated July 6, 1971:

"LRM/AJM:

"J. C. Carroll proposes to send the attached letter to:

    "Mr. Robert Howard, Station Manager
    KNBC Television
    3000 Alemeida
    Burbank, California 90205

"I heartily concur that Jay should send this letter because he, along with the company, has been wronged by Widener's 'Powers That Be' documentary. In fact, his accusation that his tape recorded words 'recorded without his knowing it' and dubbed in on the TV film, could be most effective in preventing this highly biased program from either ever appearing on the air again or, at least, causing the section referring to us to be wiped out.

"This letter has been reviewed and approved by Paul Matthew; Bill Lindblad has reviewed it from an Engineering Department point of view. In fact, he suggests that a copy be sent to Spiro Agnew (in jest, I assume).

"By copy of this letter to P. A. Crane, I am asking for legal review and opinion.

"May I have your comment so Jay can receive any further counsel that is needed.

                                      FRD

"Enclosure

cc:  P. A. Crane, Law Department
     J. C. Carroll, Steam Engineering
     H. L. McMasters, Advertising-Publicity" (Emphasis added.)

On July 7, Draeger returned a marked-up draft to Carroll with a note informing Carroll that "Enclosed are comments from various people who have reviewed your proposed letter to Mr. Robert Howard, Station Manager, KNBC Television, Burbank." Draeger's note also pointed out the comment from Phil Crane in PG&E's law department that ". . . you should clarify more exactly what you consider to be the main point of contention—that a tape recorded bit was inserted into a film portion of the interview."

On July 13, the final letter, which reflected the editorial suggestions that Draeger had collected, was mailed to Robert Howard at the KNBC studios in Burbank. The three-page letter bitterly denounced the bias of the documentary produced by appellant for KNBC, characterizing the script as "replete with halftruths, innuendos, and worse." In the letter, Carroll charged that: "Mr. Widener apparently taped our informal discussion prior to the filmed interview without my knowledge. Some carefully edited excerpts from the taped discussion are what appears [in the film transcript]." Carroll conceded, at trial, that the charge of surreptitious taping and dubbing was false:

"Q. And as you sit here today, Mr. Carroll, is there any doubt in your mind that the words His Honor just read from the transcript, the words I just read that are transcription from this film we just saw a moment ago were uttered by you when you were on camera during the interview with Mr. Widener?

"A. No, there isn't.

"Q. There's no doubt in your mind now, is there?

"A. No, there isn't. Not at this time.

"Q. Those words were not taped off camera secretly without your knowledge, were they?

"A. No, they were not."

Carbon copies of the July 13 letter from Carroll to Robert Howard were sent to appellant Widener, Jack Lemmon, and Congressmen Chet Holifield and Craig Hosmer (two Southern California congressmen who were members of the Joint Committee on Atomic Energy). Copies of the letter were also sent to a nuclear information specialist employed by the

Southern California Edison Company, to Underwood and Jordan, a New York public relations firm, to the manager of media relations for the Atomic Industrial Forum, and to the California Nuclear Liaison Committee.

On July 28, 1971, additional copies of Carroll's July 13 letter were sent by Ralph B. Dewey, PG&E's Washington representative, to several members of Congress and to members of the Federal Communications Commission. As the jury was instructed, the letters sent to members of Congress and officials of the Federal Communications Commission were "absolutely privileged and no liability of the [respondents] could result therefrom." The letters were apparently received only for the purpose of showing the general context of other pertinent communications.

Everyone connected with the Carroll letter recognized that in the commercial television industry the charge of surreptitious taping and dubbing was a grave accusation that could destroy the reputation of a person in that industry. Draeger and Dewey knew that the charge was "very serious." Robert R. Gros, vice president of public relations for PG&E, testified that the charge was "quite serious," "very unethical journalism," that he would not permit such a practice in the production of PG&E's own films, and that if anyone under his supervision had engaged in such conduct "I would have fired him." Jack Lemmon characterized the accusation as "deadly" and "the kiss of death." Reece Halsey, an expert with 32 years' experience as an agent for television writers and producers, testified that the charge would destroy a producer's reputation if it "received any spreading around in any way." Robert Howard, station manager for KNBC-TV in Los Angeles indicated that proof of such an allegation would be cause for immediate dismissal from NBC.

On August 13, 1971, Robert Howard, NBC vice president and general manager of KNBC, replied to the July 13 letter he had received from Carroll. Howard stated in his letter that the charge of surreptitious taping and dubbing had been investigated by KNBC and found to be without basis in fact. Howard's reply concluded by inviting Carroll to appear on one of the station's interview programs.

On August 24, 1971, Carroll responded to Howard's reply letter, declining the invitation to appear on a subsequent program. Carroll's August 24 letter states, in part:

"Dear Mr. Howard:

"This is in response to your August 13 reply to my July 13 letter regarding the program 'Powers That Be' produced for KNBC by Mr. Don Widener. I have reviewed the events prior to and during the actual filming of my interview with Mr. Widener on February 10 with a number of P.G. and E. people who were present. The informal discussion between Mr. Widener and me which took place prior to the actual filming occurred while the camera crew were setting up their equipment and adjusting lighting and audio levels. Our collective recollection is that some or all of the material which was ultimately used in the program was recorded during this period.

"Even accepting your explanation that the filmed interview was a misunderstanding between Mr. Widener and me on what constituted the actual interview as contrasted to our informal discussion, I must continue to voice my same complaint about the manner in which the material from this interview was used in the program. Mr. Widener knows full well that I did not decline to discuss the subject of the fuel difficulties which occurred early in the life of the Humboldt Plant as the program implies. . . .

"Finally, I have reviewed your series of KNBC editorials of August 3, 4 and 5, and am pleased to note that KNBC now advocates that 'in spite of the risks, nuclear power development should continue in Southern California.' *I take this to mean that you have no future plans for showing 'Powers That Be' or for making it available to organizations which do not share your views and mine about the important role nuclear power must play in meeting our future electrical energy requirements. If this proves to be the case,* there is obviously no purpose in my pursuing this matter further. (Italics added.)"

In Washington, Ralph P. Dewey received several replies to his July 28 letters. Dewey also conferred by telephone with Nicholas Zapple, staff counsel of the Senate Committee on Commerce, who indicated that, while the charge of surreptitious taping appeared to be untrue, NBC was "deeply concerned" over the entire matter. Following this phone conversation with Zapple, Dewey scribbled a private memorandum on the reply correspondence as follows: "Called him [Zapple] 10 a.m. 9/13. He reiterated his own view that Carroll was 'off base.' I said—the case rests; *but the fact that NBC is upset at our aggressive approach is just what we wanted.*" (Italics added.)

On August 12, 1971, an NBC memo, entitled "Interdepartment Correspondence," from J. Marshall Wellborn to. Corydon B. Dunham, stated in part as follows:

"Bob Howard telephoned today to inform me that a press relations officer at PG&E had telephoned him to discuss J. C. Carroll's letter.

"Essentially, PG&E wanted to make it clear that Mr. Carroll had written the letter on his own initiative and that his opinion did not express the views of PG&E. He stated that neither he nor Mr. Carroll had actually seen the program POWERS THAT BE, and that Mr. Carroll had made his judgments concerning the programs solely on the basis of comments made by others concerning the program and on the basis of scripts that KNBC had provided to him."

██ Appellant contends that the trial court erred in granting respondents' motion for a judgment notwithstanding the verdict, on the ground that appellant had failed to produce sufficient evidence that the defamatory statements were made with "actual malice," as required by *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254. ██ In *New York Times,* the United States Supreme Court held that, in order for a public official to be able to recover for defamation, the First Amendment required the public official to prove, with convincing clarity, the defendant's "actual malice," at the time of the publication. ██ "Actual malice" can be shown by proving either that the defendant knew of the falsity of the statement or that the defendant uttered the statement in reckless disregard for the truth. (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. at pp. 279-280 [11 L.Ed.2d at pp. 706-707].) ██ The *New York Times* rule also applies to plaintiffs who are "public figures." (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 335-336, 342-343 [41 L.Ed.2d 789, 803, 806-807, 94 S.Ct. 2997]; *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130, 154-155 [18 L.Ed.2d 1094, 1110-1111, 87 S.Ct. 1975] [plurality op. of Harlan, J.], reh. den. 389 U.S. 889 [19 L.Ed.2d 197, 88 S.Ct. 11]; *Carson* v. *Allied News Co.* (7th Cir. 1976) 529 F.2d 206, 209.) ██ "Public figures" are those who "have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at p. 345 [41 L.Ed.2d at p. 808]; see *Time, Inc.* v. *Firestone* (1976) 424 U.S. 448, 453-455 [47 L.Ed.2d 154, 162-163,

96 S.Ct. 958].) Thus, a plaintiff may be a "public figure" for all purposes or for a "limited range of issues." (See *Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at p. 351 [41 L.Ed.2d at p. 812].) ▮ Where a *private individual* has been defamed, actual malice need not be shown in order to recover for defamation. Only negligence as to the statement's truth or falsity need be shown when resolving the libel claims of private individuals. (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. 323.) However, even where the plaintiff is a private individual, actual malice—i.e., knowledge of falsity or reckless disregard for the truth—must be shown in order to recover punitive damages. (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at pp. 346-349 [41 L.Ed.2d at pp. 809-811].)

▮ Appellant contended below that he was not a public figure. However, during the settlement of jury instructions, appellant stipulated that the *New York Times* standard would be applied, and the jury was so instructed. Therefore, the *New York Times* rule will be applied here. (See *Fopay* v. *Noveroske* (1975) 31 Ill.App.3d 182 [334 N.E.2d 79, 88]; see also *Davis* v. *Schuchat* (D.C.Cir. 1975) 510 F.2d 731 [166 App.D.C. 351].)

Actual malice must be proved with convincing clarity. (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, 285-286 [11 L.Ed.2d 686, 709-710]; *Goldwater* v. *Ginzburg* (2d Cir. 1969) 414 F.2d 324, 341, cert. den., 396 U.S. 1049 [24 L.Ed.2d 695, 90 S.Ct. 701]; see also *Field Research Corp.* v. *Patrick* (1973) 30 Cal.App.3d 603, 608 [106 Cal.Rptr. 473], cert. den., 414 U.S. 922 [38 L.Ed.2d 157, 94 S.Ct. 218].) ▮ Whether there was "actual malice," as required by the *New York Times* standard, is, of course, a question of fact for the jury. (See *St. Amant* v. *Thompson* (1968) 390 U.S. 727 [20 L.Ed.2d 262, 88 S.Ct. 1323]; *Time, Inc.* v. *Hill* (1967) 385 U.S. 374, 394 [17 L.Ed.2d 456, 470, 87 S.Ct. 534].) This court has a duty to closely examine the record to determine whether it could constitutionally support a judgment in favor of the plaintiff (see *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, 285 [11 L.Ed.2d 686, 709]), but this does not involve a de novo review of the trial court proceedings wherein the jury's verdict is entitled to no weight. (See *Alioto* v. *Cowles Communications, Inc.* (9th Cir. 1975) 519 F.2d 777, 780, cert. den., 423 U.S. 930 [46 L.Ed.2d 259, 96 S.Ct. 280]; *Guam Federation of Teachers, Loc. 1581, A. F. T.* v. *Ysrael* (9th Cir. 1974) 492 F.2d 438, 441, cert. den., 419 U.S. 872 [42 L.Ed.2d 111, 95 S.Ct. 132]; *Fopay* v. *Noveroske, supra,* 334 N.E.2d 79, 87.)

▮ In the present case, appellant was required to prove by clear and convincing evidence that respondents made the defamatory statement in

the July 13 letter with knowledge that the accusation of surreptitious taping was false, or with reckless disregard of whether it was false or not. (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, 280 [11 L.Ed.2d 686, 706-707].) ▮ Reckless disregard "cannot be fully encompassed in one infallible definition"; rather, "its outer limits [must] be marked out through case-by-case adjudication, . . ." (*St. Amant* v. *Thompson, supra,* 390 U.S. 727, 730 [20 L.Ed.2d 262, 267].) It is clear, however, that it involves a stringent and subjective standard. It is not measured by whether a reasonably prudent person would have published, or would have investigated before publishing. Rather, there must be sufficient evidence to permit an inference that the defendant must have, in fact, subjectively entertained serious doubts as to the truth of his statement. (*St. Amant* v. *Thompson, supra,* 390 U.S. at p. 731 [20 L.Ed.2d at p. 267]; *Alioto* v. *Cowles Communications, Inc., supra,* 519 F.2d 777, 779; *Montandon* v. *Triangle Publications, Inc.* (1975) 45 Cal.App.3d 938, 947 [120 Cal.Rptr. 186], cert. den., 423 U.S. 893 [46 L.Ed.2d 126, 96 S.Ct. 193].) ▮ Actual malice, under *New York Times,* concentrates on the defendant's attitude toward the truth or falsity of the material published, and does not focus on the defendant's attitude toward the plaintiff. (*Cantrell* v. *Forest City Publishing Co.* (1974) 419 U.S. 245, 251-252 [42 L.Ed.2d 419, 426, 95 S.Ct. 465]; *Carson* v. *Allied News Co., supra,* 529 F.2d 206, 214.) ▮Where the defamatory statements made by the defendant do not involve an element of "hot news" and the need for expeditious release is not present, reckless disregard for the truth may be evidenced in part by failure to investigate thoroughly and verify the facts. This is particularly true where the substance of the defamatory statements, which the defendant was publishing, were such that substantial danger to reputation was apparent. (*Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. 130; *Goldwater* v. *Ginzburg, supra,* 414 F.2d 324, 339; *Carson* v. *Allied News Co., supra,* 529 F.2d 206, 211; *Fopay* v. *Noveroske, supra,* 334 N.E.2d 79, 88.) ▮ "[W]hen the story is not 'hot news,' . . . the investigation must be more thorough, and 'actual malice may be inferred when the investigation . . . was grossly inadequate in the circumstances.'" (*Vandenburg* v. *Newsweek, Inc.* (5th Cir. 1975) 507 F.2d 1024, 1026.) ▮ "[E]vidence of negligence, of motive and of intent may be adduced for the purpose of establishing, *by cumulation* and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity. See, e.g., Curtis Publishing Co. v. Butts, *supra.*" (*Goldwater* v. *Ginzburg, supra,* 414 F.2d 324, 342; italics added.) In *Curtis Publishing Co.,* the Supreme Court found that a muckraking intent, the absence of any "hot news" element, and an inadequate investigation, were all significant factors in determining actual malice.

The mere profession of a defendant that he believed in good faith that his statements were true does not automatically entitle him to a verdict in his favor. (*St. Amant* v. *Thompson, supra,* 390 U.S. at pp. 732-733 [20 L.Ed.2d at pp. 267-268].) ▮ "As in all cases, civil or criminal, turning upon the state of an individual's mind, direct evidence may be rare; usually the trier of fact is required to draw inferences of the state of mind at issue from surrounding acts, utterances, writings, or other indicia." (*Herbert* v. *Lando* (S.D.N.Y. 1977) 73 F.R.D. 387, 395.) As the court stated in *Goldwater* v. *Ginzburg, supra,* 414 F.2d 324, at page 343: "Recklessness is, after all, only negligence raised to a higher power. To hold otherwise would require that plaintiff prove the ultimate fact of recklessness without being able to adduce proof of the underlying facts from which a jury could infer recklessness. It would limit successful suits to those cases in which there is direct proof by a party's admission of the ultimate fact, certainly a situation not intended by the Supreme Court. See St. Amant v. Thompson, *supra,* 390 U.S. at 732-733, 88 S.Ct. 1323."

▮ An independent review of the evidence reveals ample evidence from which the jury might infer that respondent PG&E acted with reckless indifference to the truth or falsity of the serious charge it made against Widener. There was no "hot news" element here. The PG&E executives, who participated in the drafting and review of the July 13 corporate letter, had cause seriously to question the veracity of their sole source, Carroll. Every one of them was aware of the extreme gravity of the charge of surreptitious tampering, of Carroll's anger, and of the fact that five months had elapsed since the filming session. None of them (nor Carroll) had viewed the film, in which Carroll's words are clearly synchronized with his lip movements and he appears to be looking directly at the camera. None checked into the technical feasibility of the charged tampering. Robert Gros, vice-president of public relations, testified as follows: "Q. Now, that's a very unusual event, is it not, the secret or clandestine taping of somebody's words and putting them in a finished film that goes out over broadcast? A. So unusual I've never heard of it." However, none of them questioned Carroll about the charge. Respondent PG&E was very much aware of the possible resulting harm; the seriousness of the charge it was making called for a thorough investigation, but the record reveals that little or no investigation was conducted. The record also indicates that respondent intensely desired the suppression of the anti-nuclear power film, which it viewed as "smooth, professional and devastating." Thus the jury, in applying the "clear and convincing evidence" test, might have inferred that respondent's motive to suppress the film so overwhelmed its attention that all of

its agents, who were in a position to control sending the letter, treated the question of truth or falsity as a matter of total indifference. (See *Alioto* v. *Cowles Communication, Inc., supra,* 519 F.2d 777, 780.)

Appellant contends that there was also sufficient evidence from which the jury might have found that respondent Carroll made the surreptitious taping charge with knowledge of its falsity, or in reckless disregard for whether it was accurate or not. Carroll testified that he did not remember saying, on camera, "the things that the transcript shows [him] as saying." Matters of credibility, however, are for the jury. The jury was not required to believe Carroll's testimony that, at the time of the July 13 letter, he did not believe that he had said those words. There was much evidence that Carroll was extremely "upset and angry" at being portrayed as evasive.[2] Several months had elapsed since the filming and he could not remember specifically what he had said in the interview; his own notes of the February 10 interview indicated to him that at least some conversation concerning fuel cladding was held during the filmed interview. Carroll also greatly desired to suppress the film. There was sufficient evidence from which the jury could have found that Carroll knew the charge was false, or was recklessly indifferent as to whether his statement was accurate or not. The trial court therefore erred when it granted the motion for a judgment notwithstanding the verdict on the ground that appellant had failed to produce sufficient evidence of actual malice to support the jury's verdict.

▰▰▰ Appellant contends that the trial court was without power to make an order that it would grant a new trial if its order for judgment notwithstanding the verdict was reversed on appeal. Appellant is correct in his contention that the trial court's order conditionally granting motion for a new trial was technically defective. The trial court's order states: "In the event that, for any reason, the aforesaid order for judgment notwithstanding the verdict is reversed on appeal then the motion of defendants . . . for a new trial is hereby granted . . . ." Under section 629 of the Code of Civil Procedure, the trial court has the authority to simultaneously grant both a motion for judgment notwith-

---

[2]Carroll's February 14 notes on the February 10 interview lend some support to Widener's contention that Carroll was being evasive. Carroll's notes acknowledged that ". . . Widener apparently realized that . . . Carroll would probably not respond to questions which [Carroll] considered improper . . . ." Also, Draeger's written comments on an August 17 memo from Gros stated in part: ". . . Widener *knew* Jay [Carroll] wouldn't answer the question as result of warm-up conversation."

standing the verdict and an alternative motion for a new trial.[3] If both motions are granted by the trial court, the statute provides that the order alternatively granting a new trial will come into effect only if the order granting a judgment notwithstanding the verdict is reversed on appeal, and the order granting a new trial, if appealed from, is affirmed. The "Conditional New Trial Order," in this case, appears to be an announcement that the trial court would grant a motion for new trial sometime in the future in the event its prior order were to be reversed. Such an act would be in excess of the trial court's jurisdiction (see Code Civ. Proc., § 660;[4] see also 4 Witkin, Cal. Procedure (2d ed. 1971) § 381, p. 3172). However, the language of the order can also be read as simply granting an alternative order for a new trial; it will be so construed, to give effect to the court's manifest intention.

Appellant contends that the order granting respondents a new trial must be reversed, because (1) the specifications of reasons in the trial court's order are legally inadequate, and (2) there is "no substantial basis in the record" supporting the trial court's reasons (see Code Civ. Proc., § 657).

When a new trial is granted, section 657 of the Code of Civil Procedure requires that the trial court specify the ground or grounds upon which the new trial is granted and the court's reason or reasons for granting the new trial upon each ground stated. (See *Scala* v. *Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 363 [90 Cal.Rptr. 592, 475 P.2d 864]; *Mercer* v. *Perez* (1968) 68 Cal.2d 104, 115-116 [65 Cal.Rptr. 315, 436 P.2d 315].) In *Mercer* v. *Perez, supra,* the California Supreme Court "explained that the requirement of a specification of reasons served the two-fold purpose of encouraging careful deliberation by the trial court before ruling on a motion for new trial, and of making a record sufficiently precise to permit meaningful appellate review." (*Scala* v.

---

[3]Code of Civil Procedure section 629 provides, in part: "If the court grants the motion for judgment notwithstanding the verdict or of its own motion directs the entry of judgment notwithstanding the verdict and likewise grants the motion for a new trial, the order granting the new trial shall be effective only if, on appeal, the judgment notwithstanding the verdict is reversed, and the order granting a new trial is not appealed from or, if appealed from, is affirmed."

[4]Code of Civil Procedure section 660 provides, in part: "Except as otherwise provided in Section 12a of this code, the power of the court to rule on a motion for a new trial shall expire 60 days from and after the mailing of notice of entry of judgment by the clerk of the court pursuant to Section 664.5 or 60 days from and after service on the moving party by any party of written notice of the entry of the judgment, whichever is earlier, or if such notice has not theretofore been given, then 60 days after filing of the first notice of intention to move for a new trial."

*Jerry Witt & Sons, Inc., supra,* 3 Cal.3d at p. 363; see *Mercer* v. *Perez, supra,* 68 Cal.2d at pp. 112-115; see also *Dizon* v. *Pope* (1974) 44 Cal.App.3d 146, 148 [118 Cal.Rptr. 465].)[5] ▇▇▇ A specification of reasons, phrased in terms of "ultimate fact," fails to comply with section 657 of the Code of Civil Procedure (*Scala* v. *Jerry Witt & Sons, Inc., supra,* 3 Cal.3d 359, 370). The trial court's "reason" must do more than simply reiterate the ground of the ruling itself (*Scala* v. *Jerry Witt & Sons, Inc., supra,* 3 Cal.3d at pp. 367, 370). ▇▇▇ In specifying its reasons for granting the motion for a new trial, the trial court must briefly identify the portion of the record which convinces the court that the jury clearly should have reached a different verdict. (*Scala* v. *Jerry Witt & Sons, Inc., supra,* 3 Cal.3d at p. 367; *Mercer* v. *Perez, supra,* 68 Cal.2d 104, 116; *Oberstein* v. *Bisset* (1976) 55 Cal.App.3d 184, 187 [127 Cal.Rptr. 413].) Where the specification of reasons in the order granting a new trial is inadequate to comply with the mandate of section 657 of the Code of Civil Procedure, as construed in *Mercer* v. *Perez, supra,* 68 Cal.2d 104, the new trial order must be reversed, and the judgment will be automatically reinstated (see *Scala* v. *Jerry Witt & Sons, Inc., supra,* 3 Cal.3d 359; *Oberstein* v. *Bisset, supra,* 55 Cal.App.3d 184, 190). ▇▇▇ Where the trial court's specification of reasons adequately complies with the requirements of section 657, the court's new trial order will be upheld on appeal if there is any substantial evidence in the record to support the specified reasons (see *Dizon* v. *Pope, supra,* 44 Cal.App.3d 146, 148).

The trial court conditionally granted the new trial order on two grounds: insufficiency of the evidence on the "actual malice" issue to justify the verdict, and excessive damages. The adequacy of the "insufficiency of the evidence" ground will be examined first.

### Insufficiency of the Evidence

▇▇▇ The order adequately sets forth the ground (insufficiency of the evidence) upon which the trial court relied in granting respondents a new trial but, as appellant argues, it does not contain the adequate specification of reasons mandated by section 657 of the Code of Civil Procedure. The trial court's stated "reason" is little more than a reiteration of the ground of the ruling itself; it is wholly conclusory and stated in terms of "ultimate fact." The trial court fails to cite the respects in which the

---

[5] Since orders granting motions for new trial are infrequently reversed, "it is essential that they be the product of a mature and careful reflection on the part of the judge. Society has a manifest interest in avoiding needless retrials . . . ." (*Mercer* v. *Perez, supra,* 68 Cal.2d at p. 113.)

plaintiff's *evidence* is legally inadequate. There is no identification of the deficiencies which the trial court found in "the evidence," and in "the record," as opposed to merely in "the issues." (*Scala* v. *Jerry Witt & Sons, Inc., supra,* 3 Cal.3d 359, 366, 367, 369-370; *Oberstein* v. *Bisset, supra,* 55 Cal.App.3d 184, 187; *Previte* v. *Lincolnwood, Inc.* (1975) 48 Cal.App.3d 976, 987 [122 Cal.Rptr. 194].) ▮▮ The specification of reasons must briefly identify the evidence or portion of the record which convinces the judge that the jury clearly should have reached a different verdict (*Oberstein* v. *Bisset, supra,* 55 Cal.App.3d 184, 187).

▮▮ However, in response to a letter from defense counsel suggesting an amplification of the specification of reasons and citing the applicable case law in this area, the trial court, on January 12, 1976, filed an "Amplification of Orders of January 9, 1976," setting forth a specification of reasons for granting the motion for a new trial. This procedure was proper (see *LaManna* v. *Stewart* (1975) 13 Cal.3d 413, 418, 424 [118 Cal.Rptr. 761, 530 P.2d 1073]; *Mercer* v. *Perez, supra,* 68 Cal.2d 104, 123-124 at fn. 8; *Oberstein* v. *Bisset, supra,* 55 Cal.App.3d 184, 189).

▮▮ The specification contained in the "Amplification" adequately set forth the trial court's reasons for granting a new trial on the ground of insufficiency of the evidence with regard to respondent Carroll. ▮▮ However, no specification of reasons is given as to why "the evidence" was insufficient to support the jury's determination that "actual malice" (i.e., knowledge of falsity or reckless disregard for truth or falsity) was established with regard to respondent PG&E. Inasmuch as no reasons were specified with regard to respondent PG&E, the order granting respondent PG&E's motion for a new trial cannot be sustained on the ground of insufficiency of the evidence (see *LaManna* v. *Stewart, supra,* 13 Cal.3d at p. 425).

▮▮ The question remains whether the order granting a new trial can be sustained on another basis. Appellant contends that, even if the specification of reasons with regard to respondent Carroll was adequate, there is "no substantial basis in the record" (Code Civ. Proc., § 657) supporting the reasons which were specified by the trial court. Therefore, appellant contends, the trial court abused its discretion in granting Carroll a new trial on the ground of insufficiency of the evidence to justify the verdict. The trial court's amplification order pointed to the following evidence: The evidence shows, and the court finds, that before writing the letter of complaint dated July 13, 1971, Carroll recalled the subject matter of February 10, 1971, interview with Widener, both

before and during the filming of "Powers That Be." He also reviewed a transcript received from KNBC-TV. He reviewed a memorandum he had made on February 14, 1971, relating to the February 10 interview with Widener. Carroll also talked to Draeger, Ramsey and Weeks, fellow Pacific Gas and Electric Company employees. Carroll let them see the letter and check its contents for accuracy before the letter was mailed.

Appellant correctly argues that the record contains contradictory evidence on this matter. However, the court stated in *Dietrich* v. *Litton Industries, Inc.* (1970) 12 Cal.App.3d 704, 717 [90 Cal.Rptr. 856]: "In passing upon a motion for a new trial made upon the ground of insufficiency of the evidence the trial judge is required to weigh the evidence; and in so doing he may disbelieve witnesses and draw inferences contrary to those supporting the verdict. When the motion is granted upon this ground the appellate court may reverse only when, as a matter of law, there is no substantial evidence to support a contrary judgment. (*Mercer* v. *Perez, supra,* at p. 112.)"  ▮  Section 657 of the Code of Civil Procedure "*significantly* limits the scope of appellate authority to review new trial orders . . . ." (*Jones* v. *Citrus Motors Ontario, Inc.* (1973) 8 Cal.3d 706, 710 [106 Cal.Rptr. 28, 505 P.2d 220]; italics added.) An order granting a new trial on the ground of insufficiency of the evidence may only be reversed on appeal where there is no substantial evidence to support the trial court's specified reason (*Hale* v. *Farmers Ins. Exch.* (1974) 42 Cal.App.3d 681, 693 [117 Cal.Rptr. 146]). As the court stated in *Jones* v. *Citrus Motors Ontario, Inc., supra,* 8 Cal.3d 706, 710: ". . . [T]he trial court is required to state in its order the theory under which it concludes the jury should have returned a verdict for the moving party, and the order must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on that theory." (See *Dietrich* v. *Litton Industries, Inc., supra,* 12 Cal.App.3d 704, 717.)  ▮  It cannot be said, as a matter of law, that there is no substantial evidence to support a contrary judgment. Therefore the order granting respondent Carroll a new trial is to be upheld.

### Excessive Damages

▮ Turning to the second ground (i.e., excessive damages) on which the new trial order was based, appellant contends: (1) that there was an inadequate specification of reasons for the court's conclusion that there was no evidence of damages, and (2) even if the specification of

reasons to support the ground of excessive damages was formally sufficient under section 657, the trial court's conclusion is not supported by substantial evidence in the record.

The specification of reasons for granting the motion on the ground of excessive damages was as follows:

"In this action the jury awarded plaintiff a verdict of $750,000 general damages and $7,000,000 punitive damages.

"Except for copies sent to members of Congress, which were absolutely privileged, only the original and four copies of the July 13, 1971 letter were mailed and to be considered by the jury. There is no evidence that any of the recipients of said letter republished same. The original of the letter was sent to KNBC-TV, Los Angeles. Mr. Howard, its General Manager, testified that the letter did not affect plaintiff's relationship with National Broadcasting Company. None of the other recipients of the letter was connected in any way with the television industry.

"Plaintiff has failed to establish by a preponderance of the evidence any causal connection between the publication of the letter and his fluctuating income.

"The court is convinced that the award in this case was based on factors other than on any evidence which would indicate general or punitive damages sustained by plaintiff proximately resulting from said published letter.

"After weighing the evidence the court is convinced from the entire record, including all reasonable inferences to be drawn therefrom, that plaintiff has not suffered any loss or damage, general or punitive, by reason of the publication of the aforesaid letter."

With regard to the excessive damages ground, the form of the January 9 order adequately complies with the requirements of section 657, that the order specify the ground or grounds upon which it is granted and the reasons for granting the new trial on each of the grounds stated. (See *Mercer* v. *Perez, supra,* 68 Cal.2d 104, 109-116.)

However, appellant contends that the trial court's conclusion that there was no evidence that appellant was damaged by the defamatory

statement is not sufficiently supported by the record, and thus the trial court abused its discretion in granting the motion for a new trial. According to the January 9 order, the trial court based its conclusion that appellant was not damaged by the libel on the narrow circulation of the libelous letter and on the fact that Robert Howard, general manager of KNBC, testified that the letter did not affect appellant's relationship with the National Broadcasting Company. The order also asserts that, aside from KNBC, "None of the other recipients of the letter was connected in any way with the television industry." Appellant points out that the letter was sent to Underwood and Jordan, a nationally known advertising firm concerned with media advertising for the utility industry, and contends that the PG&E public relations department sent the letter there in order to assure wide circulation to the television industry. Appellant argues that Reece Halsey testified that a producer's successes make up the principal promotional material used by agents seeking work for writers and producers in the television industry. Each of appellant's films had been important in advancing his career. Appellant contends that NBC's plans in May 1971 to rebroadcast "Powers That Be" and make it available to other stations were cancelled because of the controversy arising from the July 13 letter, and thus the libel deprived appellant of the benefit of exposure of his last film produced by KNBC. Appellant also argues that the jury could properly have inferred that, coming on the heels of respondents' surreptitious taping charge, appellant's inability to find significant work in the profession where he was acknowledged to be among the best, was a proximate result of the libel. Additionally, appellant contends that the trial court's order fails to mention the evidence in the record of general damages for "personal humiliation, and mental anguish and suffering." (*Time, Inc.* v. *Firestone, supra,* 424 U.S. 448, 460-461 [47 L.Ed.2d 154, 166-167]; *Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. 323, 350 [41 L.Ed.2d 789, 811].) In *Gertz* v. *Robert Welch, Inc., supra,* the court stated (418 U.S. at p. 350 [41 L.Ed.2d at p. 811]): "Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury." Appellant points out that there was much evidence of appellant's personal humiliation and mental suffering which the trial court fails to acknowledge in its order.

██ However, in ruling on a motion for a new trial, the trial court may disbelieve witnesses, reweigh evidence, and draw reasonable inferences that are contrary to those drawn by the jury. ██
██ Where, as here, the trial court's reasons find *any* substantial support in the record, it cannot be said ·that the trial court abused its discretion in granting a new trial. (*Hale* v. *Farmers Ins. Exch., supra,* 42 Cal.App.3d 681, 692-693; *Thompson* v. *John Strona & Sons* (1970) 5 Cal.App.3d 705, 709 [85 Cal.Rptr. 350]; see *Jones* v. *Citrus Motors Ontario, Inc., supra,* 8 Cal.3d 706, 710-711.) Therefore, the order granting respondents a new trial on the ground of excessive damages must be affirmed. The trial court did not limit the new trial to the issue of damages; therefore, all fact issues have been set at large. (Cf. *Collins* v. *Lucky Markets, Inc.* (1969) 274 Cal.App.2d 645, 649· [79 Cal.Rptr. 454].)

The judgment notwithstanding the verdict is reversed. The order granting a new trial is affirmed. The precautionary appeal from the judgment on the verdict is dismissed as moot. Plaintiff will recover costs on appeal.

Rattigan, Acting P. J., and Emerson, J.,* concurred.

Petitions for a rehearing were denied November 28, 1977, and the opinion was modified to read as printed above. The petitions of all the parties for a hearing by the Supreme Court were denied January 19, 1978.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.