[Civ. No. 7228. Third Dist. Aug. 1, 1946.]

HELEN B. GLENN, Appellant, v. LUTHER E. GIBSON et al., Respondents.

650

E. C. Mahoney for Appellant.

O'Hara, Randall & Castagnetto and Henry H. Kilpatrick for Respondents.

PEEK, J.—This is an appeal by plaintiff from a judgment, sustaining without leave to amend defendants' demurrer to her second amended complaint, whereby she seeks to recover damages on account of certain allegedly libelous articles published in defendants' newspapers.

The complaint is in four counts, the first of which alleges that plaintiff owns and operates an auto court known as the "Brown Gables," just outside the city of Vallejo; that on February 7, 1944, under a large headline, defendants published the following libelous article in the Times-Herald.

" 'VALLEJO MORALS RAID BAGS 28'
7 Servicemen Held with 7 'Companions'

"A squad of 13 deputy sheriffs raided the widely talked about 'House of the Brown Gables' at Idora Avenue and Highway 40 early yesterday morning, netting a bag of 28 patrons and would-be patrons.

"Although the place was not a house of ill-fame in the ordinary meaning of the word, it was the closest possible substitute. Sheriff John R. Thornton commented after his men had detained 14 of the 28 persons arrested. Seven were service men, seven were 'ladies of the night.'

*"Sheriffs Swoop*

"Ten deputy sheriffs conducted the post-midnight raid under the leadership of Captain Guy Headlee and Sergeants Stanley Graves and Patrick Doyle, swooping into the 'House of the Brown Gables' at a given signal.

"They found the seven service men and seven women occupying bedrooms in the place. During the time it took to round up those who were arrested, get them dressed and prepare to take them to the City Hall for questioning, 14 other persons—again seven men and seven women—drove up to the establishment in taxi cabs in search of rooms.

*"Late Arrivals*

"The 14 late arrivals were released after being questioned by District Attorney Phillip B. Lynch in an early morning quiz session which started at 1:30 a.m. and lasted until 5:30 a.m.

"Those held to face charges of vagrancy were:

(Here follow the names, ages and addresses of seven women.)

*"The Servicemen*

(Here follow the names, ages and service designations of seven men.)

*"Not Married*

" 'All those arrested had registered at the 'Brown Gables' as man and wife, but afterward admitted to officers that they were not married,' Sheriff Thornton said.

"District Attorney Lynch said the owner of the premises, Hugh Glenn, will be charged with operating a hotel without a license and with conducting a disorderly house.

"It was recalled that the application by Glenn to operate a hotel at 145 Idora Avenue was rejected. (end of p.1.) (p.2.heading) ARRESTED IN MORALS RAID ON VALLEJO HOUSE several months ago by the Solano Planning Commission.

"In a joint announcement, Sheriff Thornton and District Attorney Lynch said they will urge the strictest penalty for Glenn.

*"Suspect Others*

" 'There are several other places in the township suspected of the same violation, and as soon as necessary evidence is obtained, similar raids will be conducted on them,' Sheriff Thornton warned.

"The sheriff reported that numerous complaints on the premises had been made both by government authorities and by neighbors, and that the raid had been undertaken only after a month's investigation by the sheriff's office.

"Sheriff Thornton said evidence obtained by his office's investigation and raid on the premises indicated that Glenn was obtaining $5 a night for each room he rented, and that it was not uncommon for a room to be rented several times in a night.

"There are a dozen rooms in the 'House of the Brown Gables' and often all have been occupied in the past.

"Most of the traffic to the 'House of the Brown Gables' was in taxi-cabs and a report on this phase of the goings-on there is being made available to the Office of Price Administration and the Office of Defense Transportation.

"The 14 men and women arrested, are scheduled to be arraigned in justice court this morning. All of the women were given an examination for venereal disease at the city-county health clinic."

Count two of the complaint alleges that on February 8, 1944, under a photograph of plaintiff's premises, the defendants published in said Times-Herald, and readers thereof saw and read the following libelous article:

"THIS IS THE INFAMOUS 'BROWN GABLES,' which up until Saturday night is alleged to have been a sort of drive-in house of prostitution on Idora Street just off Highway 40. Sheriff's deputies headed by Captain Guy Headlee and District Attorney Phillip B. Lynch, rounded up 28 persons in a raid, 14 of whom were jailed and charged with vagrancy. (Photo by Times-Herald)"

Count three charges that on February 7, 1944, the defen-

dants published in said News-Chronicle, and readers thereof saw and read, the following libelous article:

### "The Disease Problem

"When the brothels of lower Georgia street were closed recently at the instigation of the U. S. Social Security investigators the prediction was freely made that the activities would go on under cover.

"The particular women involved might leave the city but others would come in to take their places (it was said) and many times the others would be more liable to spread disease because they would be handicapped by clandestine surroundings.

"The early morning raids Monday by the sheriff's office would seem to give a certain amount of weight to these predictions.

"Certainly the activities imputed to the 'House of the Brown Gables' would give substance to such predictions.

"The thing that is lacking for a logical comparison of the two situations are figures on the prevalence of venereal disease. It is on the venereal disease ground alone that steps to curb promiscuous prostitution have been taken in military areas— these steps being taken elsewhere as well as in Vallejo.

"If the figures would show a decline in venereal disease rates since the brothels, the justification for the tight restrictions would be made fully, but, on the other hand, if the rates show an increase, it would indicate that places of the reputation imputed to the 'House of the Brown Gables' are doing an even bigger disservice to the nation's war effort than the Georgia Street places ever were."

Count four alleges that on or about February 7, 1944, plaintiff was charged, among other things, by complaint filed in the Justice's Court of Vallejo Township, with a violation of section 316 of the Penal Code; that on March 8th and 9th she was tried before said court and found not guilty of said charge; that nevertheless on Sunday, March 12, 1944, defendants published in the Times-Herald, and readers thereof saw and read, the following libelous article:

### "Brown Gables Guilty Verdict
### Mother, Son Freed on 1 Count,
### Found Guilty on 2 Others."

"The infamous Brown Gables case—which opened last February 6 when sheriff's deputies raided the premises and

arrested seven unmarried couples who were occupying bedrooms there—ended in justice court yesterday with convictions against the operators on two counts of violation of the county zoning ordinance and a not guilty verdict on the charges of operating a disorderly house.

"The findings by Judge John J. Bradley were: In the case of Hugh Glenn——

"A. Count one—operating a disorderly house—not guilty.

"B. Count two—operating a hotel in a residential district —guilty.

"C. Count three—operating a hotel without a use permit —not guilty."

In the case against Helen B. Glenn, Hugh Glenn's mother:

"A. Count one—not guilty.

"B. Count two—guilty.

"C. Count three—guilty (as the owner, the use permit was deemed her sole responsibility).

"Judge Bradley sentenced each of the Glenns to pay $300 fine and serve three months in the county jail on the hotel operation charge, but he suspended the three month sentence on the condition that neither of the accused again tries to operate a hotel at the Brown Gables, 145 Idora Avenue.

"He also fined Mrs. Glenn $300 on the charge of operating a hotel without a use permit.

*"Execution Set Over*

"At the request of Defense Attorney E. C. Mahoney, of Burlingame, the execution of the sentence was suspended for five days and the Glenns were released on $500 cash bail each.

"In attempting to prove that the Glenns were operating the Brown Gables as a disorderly house for the purpose of assignation, District Attorney Phillip B. Lynch had tackled one of the most difficult charges in the Penal Code.

"Summing up the case against the Glenns on this count, Judge Bradley on two occasions pointed out that in most cases of disorderly houses, the only possible conviction is on circumstantial evidence. This conviction must be, however, on proof that shows guilt 'beyond any reasonable doubt.'

"Further analyzing the case against the Brown Gables, the court pointed out that the one instance of operation was the night of February 6, when the sheriff's office, in a raid, trapped 14 unmarried men and women occupying rooms at the premises.

*"Not Enough Evidence*

"This isolated instance, the judge pointed out, did not constitute sufficient circumstantial evidence; there was no proof that the Glenns had knowledge that the couples were unmarried; there was no evidence that such conditions had been continued over a period of time.

"Only a neighbor testified to (continued on page 2, col. 3)

*"Hugh Glenn, Mother Guilty in Brown Gables Hearing*
(continued from Page 1)

specific instances of disorderly conduct at the premises and this single testimony was not sufficient to base a conviction.

"The court felt that there was evidence pointing to the probability that the premises had been operated as a disorderly house, but that the amount of evidence presented was not sufficient nor complete enough to justify the conviction.

*"No Doubt on Others*

"Judge Bradley said further there was no question on the matter of operating a hotel without a license—that Glenn himself in his testimony had admitted that he was operating the premises as a hotel. Neither was there any question that the operations were being conducted without a use permit.

"In connection with the use permit, however, the court established that the violation was against the owner of the premises—in this case Mrs. Glenn—and not against the son.

"Judge Bradley also took occasion to comment on the matter of venereal disease allegedly contracted by enlisted men in the Navy after visits to the Brown Gables.

" 'We have an unusual situation in this community,' the court commented. 'There is a large number of naval personnel here, and policing is a big job carried on diligently with a minimum amount of help. It seems to me that the court's duty in this community is not only to sit in judgment but also to determine the best possible policy to follow in connection with our local situation.'

*"Others Do the Same*

"Certainly if the defendants are guilty of operating a disorderly house, Judge Bradley continued, other hotels in this community must be equally guilty. They sent couples to the Brown Gables when they were unable to handle them, and 'clerks from these establishments were here to testify that they never transferred anyone to the Brown Gables that they would not have accepted in their own premises.'

"Holding the civil authorities are at a disadvantage in the matter of dealing with enlisted men, the court suggested that if the naval authorities were truly anxious on the score of venereal disease, they had it within their power to halt the entrance of service men into such premises as the Brown Gables.

" 'The naval authority's shore patrol, if placed at such places as the Brown Gables, can go to an enlisted man and ask him what he is doing there and get a full explanation from him,' the court said. 'If the Brown Gables has been a source of infection of enlisted personnel, the naval authorities have it within their power to eliminate it in five minutes.'

## "Can Use Patrol

" 'The naval authorities can place a patrol in front of every hotel in this community where enlisted men are contracting venereal disease and eliminate it immediately,' the court continued.

"Judge Bradley pointed out that the civilian law enforcement agencies have no right to stop a man and woman and question them as to their marital status if they have every outward appearance and claim to be man and wife. There is no civilian law which will discourage the situation, but naval authorities do have that power, he asserted.

"Judge Bradley also castigated the 'tie-up of convenience' between hotels in Vallejo and the Brown Gables, and referred again to the testimony of the hotel clerks.

## "Mrs. Glenn Testifies

"Yesterday's session opened with Mrs. Glenn on the stand under cross-examination by District Attorney Lynch. She testified that she makes all the beds and does all the cleaning at the premises and that the tenants are not expected to do the housework about their rooms.

"For rebuttal witnesses, District Attorney Lynch called Mrs. O'Reilly, the next-door neighbor; Mrs. E. C. Valentine, who lives at the end of the block; Mrs. R. W. Hooper, Mrs. Harriett Scott; Fred J. Shortridge, Solano county sanitary inspector; Stanley Cravea, deputy sheriff, and Walter Hahn, Jr., secretary-advisor of the Solano County Planning Commission.

"All testified that the Brown Gables, to their knowledge, had the reputation of being a disorderly premises."

In addition to the foregoing matter, the complaint alleges

that by certain designated language defendants charged and were understood as charging that plaintiff was morally corrupt and vile in character and guilty of keeping and operating a disorderly house upon said premises, and that by said malicious act plaintiff was exposed to hatred, contempt, ridicule and obloquy. It is also alleged that by reason of the publications plaintiff was injured in her reputation and good name and experienced great mental suffering, to her damage in specified amounts; and that by reason of said publications plaintiff's business of operating an auto court has been completely destroyed and the reputation and good will of her place of business has been so publicly maligned that the public no longer patronizes the same, to the further damage of plaintiff in a stated amount. Additionally, and in relation to the headlines of the article of March 12th, in count four it is alleged that "the sub-headline in said publication was absolutely false in that plaintiff's son, Hugh Glenn, was found guilty on only one count of said complaint, which had to do only with a county zoning ordinance, and not on two counts, as charged in said publication."

Although in her opening brief on appeal plaintiff has failed to comply with rule 15a of Rules on Appeal, in not setting forth separately each point therein, it indirectly appears that she attacks the order of the trial court on the following grounds: That the complaint sufficiently alleges the falsity of the articles published, and that said articles are not privileged, or, if they were, then malice was sufficiently alleged.

By section 45 of the Civil Code, libel is defined as a "false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."

It is readily apparent from a reading of said section that the falsity of the publication is an essential ingredient of the wrong complained of. Therefore, if on the face of the complaint the gist or sting of the libel is shown to be true, or a truthful report of the proceedings which the publisher purports to recount, no action lies, and the demurrer was properly sustained. (*Chavez* v. *Times-Mirror Co.*, 185 Cal. 20, 21 [195 P. 666]; *Mortensen* v. *Los Angeles Examiner*, 112 Cal.App. 194, 205 [296 P. 927].)

While the complaint herein does not present as clear

a case as that in *Chavez* v. *Times-Mirror Co., supra,* nevertheless it is conspicuously evident that nowhere in the complaint herein is there a denial of the truth of the matters charged, either direct or indirect, other than the very limited one contained in count four. Here, as in the Mortensen case, the only portion of the published charges which the complaint denies is a nondamaging statement contained in the subheadlines: "Mother, Son Freed on 1 Count, Found Guilty on 2 Others." The basis for this denial is the fact that, as shown in the body of the article, plaintiff's son was freed on two counts and found guilty on only one. However, Hugh Glenn is not a party to this proceeding nor is plaintiff suing on his behalf. Obviously therefore, the statement, even if it contained defamatory implication as to him, would not constitute a libel upon plaintiff. (*Skrocki* v. *Stahl,* 14 Cal.App 1, 4-5 [110 P. 957].) Such denial does not meet the requirements ·of the rule that "the allegations of the falsity of the charge must be as broad as the charge itself." (*Mortensen* v. *Los Angeles Examiner, supra,* at page 202.)

In the comparatively recent case of *Emde* v. *San Joaquin County etc. Council,* 23 Cal.2d 146, 160 [143 P.2d 20, 150 A.L.R. 916], a further amplification of the rule applicable to plaintiff's charge of falsity made in connection with said sub-headlines has been stated thus:

"It is generally agreed that it is not necessary to prove the literal truth of an allegedly libelous accusation in every detail, so long as the imputation is substantially true so as to justify the 'gist' or 'sting' of the remark. (*Hearne* v. *DeYoung,* 119 Cal. 670 [52 P. 150, 499]; *Kurata* v. *Los Angeles News Pub. Co.,* 4 Cal.App.2d 224, 227 [40 P.2d 520]; *Mortensen* v. *Los Angeles Examiner,* 112 Cal.App. 194, 203 [296 P. 927]; *Skrocki* v. *Stahl,* 14 Cal.App. 1, 5 [110 P. 957]; 3 Rest., Torts, sec. 582, comment e; Prosser on Torts, sec. 95, pp. 855, 856.)"

In seeking to sustain the sufficiency of the complaint, plaintiff relies on the allegation that "by reason of said publication . . . plaintiff was injured in her reputation and good name," and from this premise argues that "It would follow that true statements could not affect her reputation and good name and thus an issue has been created as to whether the statements made by respondent were true or false, the pleader indirectly charging that they are false."

We do not agree with the conclusion that "true statements could not affect her reputation and good name." The

injurious character of a publication is to be gauged by the effect it would have on persons unacquainted with the plaintiff and hearing of him for the first time. (*Ervin* v. *Record Publishing Co.*, 154 Cal. 79, 82 [97 P. 21, 18 L.R.A.N.S. 622].) On such persons, obviously, a truthful accusation and a false accusation masquerading as the truth would have the same effect, as far as their conduct toward or regard for the accused person was concerned. Moreover, plaintiff's reputation and good name are not in issue; the averment relied upon by plaintiff no more than reaffirms that which is presumed, and being mere surplusage cannot take the place of an essential allegation. (*Draper* v. *Hellman etc. Bank,* 203 Cal. 26, 42-43 [263 P. 240]; *Davis* v. *Hearst,* 160 Cal. 143, 186 [116 P. 530]; 36 C.J. § 200, p. 1236; 33 Am.Jur. § 236, p. 214.)

■ Irrespective of questions relating to the pleading of falsity, it is readily apparent that the complaint herein is further fatally defective in that it discloses a case of qualified privilege yet fails to allege malice in such a manner as to overcome the case thus disclosed.

■ In the first place, the complaint shows that the articles were published during times of war in a community where extensive war activities were being conducted, both civilian and military, and where the welfare of those engaged therein was a matter of vital concern to every right-thinking person. It would thus appear that the complaint on its face shows that said publications came within the meaning of subdivision 3 of section 47 of the Civil Code, which, prior to its amendment in 1945, and as it read at the time when the right of action herein, if any, arose, provided:

"A privileged publication is one made— . . . 3. In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

Particularly applicable to the situation thus disclosed is the rule enunciated in 3 Restatement, Torts, section 598, wherein it is said in part that:

"An occasion is conditionally privileged when the circumstances induce a correct or reasonable belief that (a) facts exist which affect a sufficiently important public interest. . . .

The rule stated in this Section is applicable when any recognized interest of the public is in danger, including the interest in the prevention of crime and the apprehension of criminals, the interest in the honest discharge of their duties by public officers, and the interest in obtaining legislative relief from socially recognized evils.''

The complaint discloses a further situation where the communications in question, if without malice, would be qualifiedly privileged under the provisions of subdivision 4 of section 47 of the Civil Code, relating to reports of judicial proceedings. Said section reads in part:

''A privileged communication is one made . . . 4. By a fair and true report, without malice, in a public journal, of (1) a judicial, (2) legislative, or (3) other public official proceeding, or (4) of anything said in the course thereof, or (5) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant shall have been issued.''

That the articles of which plaintiff complains come within this category likewise seem to be clear. They are shown to comprise a history of the proceedings which, according to plaintiff's own recital set out in count four, were instituted by the filing of a criminal complaint in the justice's court of the proper township ''on or about February 7th, 1944,'' the date of the first article, and culminated in court proceedings on March 8 and 9, 1944, which were reported in the alleged libelous article published March 12, 1944. The privileged character of reports of this kind has been recognized in numerous decisions by various courts. (*McClure* v. *Review Pub. Co.*, 38 Wash. 160 [80 P. 303, 305]; *Kilgore* v. *Koen*, 133 Ore. 1 [288 P. 192, 194-195]; *Sherwood* v. *Evening News Assn.*, 256 Mich. 318 [239 N.W. 305, 306-308].) In determining the scope of the term ''judicial proceeding'' within the purview of the rule, the courts of this state seem to take a comparatively broad view of the question. (*Kurata* v. *Los Angeles News Pub. Co.*, 4 Cal.App.2d 224, 228 [40 P.2d 520].)

■ It follows that, as the complaint herein discloses the existence of the aforementioned qualified occasions, it remains to be seen only if their effectiveness as a complete bar to the action has been undermined by a sufficient showing of malice; for, in the case of a qualified privilege ''malice is not inferred from the communication or publication'' (Civ.

Code, § 48), and hence, "where the complaint discloses a case of qualified privilege, no malice is presumed and in order to state a cause of action the pleading must contain affirmative allegations of malice in fact." (*Locke* v. *Mitchell,* 7 Cal.2d 599, 602 [61 P.2d 922].)

The case last cited furnishes a definite answer to this question. The language of the pleading therein is in general similar to that contained in the complaint before us, wherein, as has been seen, it is alleged that "by such malicious act the plaintiff was exposed to hatred, contempt, ridicule and obloquy." In said case the court stated:

"The pleading, of course, does use the words 'malicious' and 'maliciously,' but these words, standing alone, are not sufficient to charge malice in fact. The rule as stated in *Henry* v. *Moberly,* 6 Ind.App. 490 [33 N.E. 981, 983, 984], is as follows: . . . 'When the complaint discloses that the occasion was privileged, the allegation that the language was false and malicious is not sufficient, but in such case the complaint must further show that the defendant acted maliciously in publishing it.'" (*Locke* v. *Mitchell, supra,* at page 603.)

With respect to plaintiff's argument that the headline "Brown Gables Guilty Verdict" would be understood as implying that plaintiff had been found guilty of a morals charge, "since defendant's newspapers for several days had been stressing only the morals charges against plaintiff," it is pertinent to point out that in none of the articles preceding the one carrying said headline was plaintiff's name or identity in any way mentioned, and therefore a person reading it would have no reason to associate plaintiff with the case unless or until he had read the succeeding subject matter which explains in detail the exact meaning of the headline. Furthermore, it appears that the statement contained in said headline is literally and essentially true. The cases cited by plaintiff in support of her argument, namely, *Davis* v. *Hearst,* 160 Cal. 143 [116 P. 530], *Commercial Pub. Co.* v. *Smith,* (C.C.A. 6) 149 F. 704 [79 C.C.A. 410], and *Pratt* v. *Pioneer Press Co.,* 30 Minn. 41 [14 N.W. 62], which holds that a libelous headline may make the publication actionable if it goes beyond the subject matter contained in the body of the publication, are not in point. In the Davis case the headline read: "Exposures Found to be True"; but the text following the headline showed that only one of the derogatory charges was found to be true. In the Commercial Publishing Com-

pany case, the headline was "Murderer Arrested," although from the body of the article it appeared that the person arrested was only a suspect. In the Pratt case, it was held that the heading "Culpable Neglect," in reference to the activities of a physician, might constitute actionable defamation where none of the acts described in the article necessarily justified the charge; "For," said the court, "all the facts stated in the body of the article might be true, and not constitute culpable neglect on the part of the plaintiff." In the present case, if the facts stated in the body of the article are true, they necessarily show a "Brown Gables Guilty Verdict."

■ Finally, it may be observed that, insofar as the article in question states that plaintiff has been found guilty of operating a hotel in a residential district and without a use permit, it is not libelous *per se* or at all. (3 Rest., Torts, § 569.) Whatever opprobrium would attach to the violation of the ordinances in question would be injurious only insofar as it had a tendency to injure plaintiff in her occupation. But since plaintiff's occupation is unlawful she would not be entitled to recover for such an injury. (*Johnson* v. *Simonton*, 43 Cal. 242, 249-250.) Indeed, it is doubtful if plaintiff may complain of anything said about the business she is found to have been conducting, and which she does not deny conducting unlawfully. "And it thus appearing that the alleged libels were only in respect of an unlawful business carried on by the plaintiff, it results that the action cannot be maintained, 'for I think (said Best, Ch.J.) that where a man complains of a libel written respecting an illegal transaction in which he is engaged, the illegality of that transaction is an answer to his complaints.' (3 Bing, 440; see, also, Hilliard on Torts, 278; Townsend on Libel and Slander, 197-8, and cases there cited.)" (*Johnson* v. *Simonton, supra,* at pages 249-250.)

The order and judgment are affirmed.

Adams, P. J., and Thompson, J., concurred.