[Civ. No. 21511. Fourth Dist., Div. Two. Feb. 2, 1981.]

PETER HEINZ ROLLENHAGEN, Plaintiff and Appellant, v. CITY OF ORANGE et al., Defendants and Respondents.

COUNSEL

Arthur B. Kalnit for Plaintiff and Appellant.

Grace, Neumeyer & Otto, John Carpenter Otto, Richard A. Neumeyer, Thomas W. Ely, Lillick, McHose & Charles, Lawrence W. Dam, Moore, Graves & Madory and Mark J. Meyers for Defendants and Respondents.

OPINION

**HYDE, J.***—Plaintiff appeals from a judgment non obstante veredicto (NOV) and conditional grant of a new trial after a trial by jury where he had recovered verdicts against Columbia Broadcasting System, Inc. (CBS) and Elizabeth Mazur in a defamation action. Defendant City of Orange had been dismissed by the trial court at the commencement of the trial on a motion by the city for judgment on the pleadings. A notice of appeal was filed by plaintiff on this judgment but nothing more has been done, and it is not mentioned in plaintiff's brief. Therefore, that judgment is affirmed.

---

*Assigned by the Chairperson of the Judicial Council.

As to the judgment with respect to CBS and Mazur, plaintiff raises a number of issues.

First, he argues that because the court denied the motions of these two defendants for nonsuit and for directed verdict, it should likewise have denied their motion under Code of Civil Procedure section 629— the judgment notwithstanding the verdict section. The simple answer to this contention is that the court clearly stated: "The Court, in this instance, should have granted the motion made for a directed verdict and the case should not have gone to the jury."

There is some question raised by defendants that the trial court never did make a ruling on the motions for nonsuit and directed verdict at the close of the case. Depending on the construction of the trial court's language, one might argue either way, but it is immaterial. ■ There is no requirement in the law to prevent a court from granting a motion for judgment NOV without having gone through a motion for directed verdict or nonsuit. Under Code of Civil Procedure section 629 as amended in 1963, the condition that a motion for directed verdict had to be first made before a judge could consider NOV was eliminated. (See 4 Witkin, Cal. Procedure (2d ed. 1971) § 376, p. 3170.)

The crux of plaintiff's appeal is that the trial court erred in granting this judgment NOV, period. ■ Plaintiff correctly points out that the court is to be guided by the same rules that govern the granting of a nonsuit or directed verdict. The court may not weigh the evidence but must resolve all conflicts in the evidence in favor of the plaintiff and decide, as a matter of law, that plaintiff would not be entitled to a verdict in his favor. (See 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 374, p. 3168; *Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282].)

Considering the evidence of plaintiff in the most favorable light, the record demonstrates:

During the year 1973 plaintiff was self-employed in an auto repair business under the name of Peter's Foreign Car Service. During that year, plaintiff met defendants Catherine and Elizabeth Mazur. Catherine owned, but both ladies operated, a 1965 Volkswagon which was to become a focal point of this litigation. They had a number of service jobs done on the car by plaintiff without complaint. In September 1973, on one of the service calls, plaintiff told Elizabeth it would be

a good idea if she had a valve job, although the car was running well. Later this was done for $130. The car came back on October 4, 1973, for a free check, and it was running well at that time. The next day the engine froze up on the freeway, and the car had to be towed into plaintiff's shop. Plaintiff informed both ladies that he would have to look at the engine in detail to see what the problem was, and, if it was any faulty work of plaintiff, he would repair it at no cost to the Mazurs. Otherwise, the Mazurs would have to pay. When the engine was inspected, it was found to be bone dry of oil, which led plaintiff to the conclusion that someone had deliberately pulled the pan plug, drained the oil, and replaced the plug. The car had been driven 80 to 90 miles from the time it had previously left the shop after the checkup, so plaintiff knew it could not be his omission at the time of the valve job or the checkup. He called Catherine and told her it would be $50 to tear the engine down and see what it would take to repair it. She approved this, and he did so. He then gave her an oral report and an oral itemized cost breakdown of the repair. She did not immediately authorize this but had her insurance man come out and look at it, so she could possibly collect on a vandalization clause of her policy. She eventually authorized him to do the work. He repaired the car and charged $591. At that time he also told Elizabeth, who had come in to pick up the car, someone had stolen a headlight assembly off the car which he had replaced and she should go right down to the City of Orange Police Department and file a report which would be the basis for an insurance claim. Elizabeth did so, and, when she got there, she was introduced to Detective Sirks. By reasonable inference from the record, it appears that he told her some horror stories about plaintiff's operation, and that they had had complaints, and that he was going to investigate plaintiff further. He prepared a detailed six-page police investigation report which contained the history of Elizabeth's dealings with plaintiff.

Armed with this report, Sirks apparently contacted a representative of the State Consumer Affairs Department and enlisted his cooperation in further investigating plaintiff's operation. As a part of that investigation they took a City of Orange car that was testified to be in no need of repair and, after rendering a spark plug inoperative, took it into plaintiff's shop. It was left there as a "sick turkey" and was to be picked up later by the two undercover men. There was testimony by plaintiff later that the car was not in fact all right but needed the work done on it by him. In any event, this fact was reported in the later-to-be-discussed libelous statement.

Plaintiff did not realize he was being set up. For, at this time, either Sirks or Brown from Orange City Police Department called CBS and told Mr. Wiman of CBS that they had a breaking "consumer type" story. Wiman knew Brown and Sirks from prior contacts. Wiman, after clearing the CBS assignment desk, took his crew to the Orange Police Department and there interviewed Sirks extensively and reviewed the police reports. Sirks also told Wiman about the decoy car and that they were going down directly to pick it up. Sirks called the Mazurs and told Elizabeth she should come down for an interview. She was reluctant, but he told her she owed it to other citizens, so she did. She, in a filmed interview, made statements to the effect that she had been victimized. Sirks and the state man then said they were going to go over and pick up the car, so the CBS crew went to a location across the street from plaintiff's place and waited and watched to see what would happen when the car was picked up. In due course, Sirks and the state man showed up and claimed the car by paying the bill presented by plaintiff. As soon as plaintiff took the money, he was arrested by Sirks, handcuffed, and paraded out before the grinding camera. The arrest was made for violation of Business and Professions Code section 9884.9—failure to give a written estimate. He was taken to the police department, booked and later released. The next day, he called Wiman at CBS and begged Wiman not to broadcast the story or show the film, as it would ruin his business. Wiman said it was up to others, but he wanted to come out and get plaintiff's side of the story. Plaintiff agreed to this, and Wiman did come out the next day and spent some 45 minutes interviewing plaintiff, listening to his side of the story, and filming an interview.

After seeing what Wiman had after the arrest and first interviews with Sirks and Elizabeth, CBS had decided it would not run the story in that form, because it was not a whole story. This brought about the second interview with plaintiff. The story was then run two days later showing the arrest, the interview with Elizabeth, and part of the interview with plaintiff. No videotape exists, although the transcript of the story was preserved and is appendixed hereto.

While plaintiff sets forth in greater detail in his brief all the points on which he relies, the above statement incorporates the main points raised as factually substantiating his position with regard to the defamation.

Plaintiff contends that the trial court erred in holding that the defamatory broadcast was privileged as constituting "Fair Comment"

under Civil Code section 47, subdivision 3. CBS asserted from the beginning that the broadcast was qualifiedly privileged under that section, which deals with the so-called fair comment privilege on matters of general interest, and that to recover in this situation the plaintiff must show that the defendant acted with malice. Defendants argue that long before the United States constitutional limitations were imposed on libel plaintiffs, California recognized a privilege of fair comment on matters of general public interest as part of Civil Code section 47, subdivision 3. That section provides: "A privileged publication or broadcast is one made . . . [¶] 3. In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

Beginning with *Snively v. Record Publishing Co.* (1921) 185 Cal. 565 [198 P. 1], through *Noral v. Hearst Publications, Inc.* (1940) 40 Cal.App.2d 348 [104 P.2d 860]; *Glenn v. Gibson* (1946) 75 Cal.App.2d 649 [171 P.2d 118]; *Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791 [197 P.2d 713], the California courts have recognized basic fair speech principles as paramount over plaintiffs whose status might be private or public, so long as there was no malice, and the subject matter was one of public interest. *Maidman v. Jewish Publications* (1960) 54 Cal.2d 643, 652 [7 Cal.Rptr. 617, 355 P.2d 265, 87 A.L.R.2d 439], held that even editorial comment and criticism of a prominent personage of a religious group was nonactionable if it was fair in the sense of giving the public the benefit of comment which it is entitled to have rather than for any ulterior motive of causing harm to the plaintiff. "The crucial issue involved in determining the applicability of the 'fair comment' privilege is whether or not the publication was made in the public interest." (*Williams v. Daily Review, Inc.* (1965) 236 Cal.App. 2d 405, 417 [46 Cal.Rptr. 135].)

Plaintiff cites and argues the applicability and effect on the state courts of the recent relaxation of the stringent limitations applied by the federal cases that severely restricted libel actions during the years involved here. Plaintiff seems to argue that, because the United States Supreme Court has moved back to a more liberal position with regard to libel plaintiffs, this somehow alters the California approach to these cases. The restrictive atmosphere developed by the United States Supreme Court began with *New York Times Co. v. Sullivan* (1964)

376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], and culminated in 1971 with *Rosenbloom* v. *Metromedia* (1971) 403 U.S. 29 [29 L.Ed.2d 296, 91 S.Ct. 1811]. The rule as established by that line of cases was that a public official or public figure libel plaintiff must prove by "clear and convincing evidence" that defendant acted with "actual malice" in publishing a libelous statement. This could not be determined by looking at the publication alone. It could be proved only by a showing of absolute knowledge of the falsity of the publication or recklessness to the point of ignoring the obvious falsity of the publication. An "intent to inflict harm" is not, alone, sufficient. (*Henry* v. *Collins* (1965) 380 U.S. 356, 357 [13 L.Ed.2d 892, 893, 85 S.Ct. 992].) "Ill will" is immaterial. (*Garrison* v. *Louisiana* (1964) 379 U.S. 64, 73 [13 L.Ed.2d 125, 132, 85 S.Ct. 209].) And, "failure to investigate" does not impair the privilege. (*Beckley Newspapers* v. *Hanks* (1967) 389 U.S. 81 [19 L.Ed.2d 248, 88 S.Ct. 197]; *St. Amant* v. *Thompson* (1968) 390 U.S. 727, 730 [20 L.Ed.2d 262, 266, 88 S.Ct. 1323].) Then, in 1971, the Supreme Court, in *Rosenbloom* v. *Metromedia, supra,* 403 U.S. 29, extended the *New York Times* rule to all cases where a media publication dealt with a subject of general public interest, notwithstanding the plaintiff's standing as a public or private figure.

In 1974, the Supreme Court retreated from the almost total restriction on libel plaintiffs in the area of "public interest" set forth in *Rosenbloom*, and held in *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997], that the First Amendment did not require the states to apply the *New York Times* rule in libel actions brought by truly private individuals, notwithstanding the general public interest in the subject matter. But, as defendants point out, *Gertz* did not attempt to mold the state standards into a uniformly acceptable federal standard. It specifically recognized the rights of individual states to apply any reasonable standard—short of absolute liability.

"We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. . . [¶] Our accommodation to the competing values at stake in defamation suits by private individuals allows the States to impose liability on the publisher or broadcaster of defamatory falsehood on a less demanding showing than that required by *New York Times*." (418 U.S. at pp. 347-348 [41 L.Ed.2d at pp. 809-810].)

At least four states by their highest courts have rejected what appears to be the negligence standard permitted by *Gertz* and continued to apply the *New York Times* rule whenever an allegedly defamatory publication concerns a matter of public interest:

INDIANA—*Aafco Heating & Air Con. Co.* v. *Northwest Pub., Inc.* (1974) 162 Ind.App. 671 [321 N.E.2d 580], cert. den. (1976) 424 U.S. 913 [47 L.Ed.2d 318, 96 S.Ct. 1112].

COLORADO—*Walker* v. *Colorado Springs Sun, Inc.* (1975) 188 Colo. 86 [538 P.2d 450], cert. den. (1975) 423 U.S. 1025, [46 L.Ed.2d 399, 96 S.Ct. 469].

VIRGINIA—*Newspaper Pub. Corp.* v. *Burke* (1976) 216 Va. 800 [224 S.E.2d 132].

NEW YORK—*Chapadeau* v. *Utica Observer-Dispatch, Inc.* (1975) 38 N.Y.2d 196 [379 N.Y.S.2d 61, 341 N.E.2d 569.]

The supreme courts of these states have expressed fear that a negligence standard in a public interest setting promotes self-censorship and causes publishers to shun controversial articles. If an individual becomes involved in a matter of public interest, whether he is famous, infamous, or unknown, should be irrelevant; there is no cogent reason to subject the press to a varying standard of liability because of the subject's status.

While the above states were apparently compelled to resort to their courts to define a post-*Gertz* liability standard for private individual plaintiffs, no such uncertainty exists in California. The California standard is codified in Civil Code section 47, subdivision 3, as granting a qualified privilege to all publications which concern a matter of legitimate public interest. This standard of liability predates *Gertz* by over 50 years and the only impact the *Gertz* decision has on the standard is to decree it a constitutionally acceptable one.

Absent evidence of malice, the Civil Code section 47, subdivision 3, privilege governs and the defendants are entitled to judgment as a matter of law. "Malice" under California law means "...that state of mind arising from hatred or ill will toward the plaintiff; provided, however, that such a state of mind occasioned by a good faith belief on the part of the defendant in the truth of the libelous publication or broad-

cast at the time it is published or broadcast shall not constitute actual malice." (Civ. Code, § 48a, subd. 4(d).) Moreover, by statute, malice under section 47, subdivision 3 may not be inferred from the publication, but requires proof by extrinsic facts. (Civ. Code, § 48.)

There was no evidence whatsoever at trial that any defendant against whom this appeal is directed harbored any hatred or ill-will toward plaintiff Rollenhagen at any time. There was no evidence that anyone at CBS had ever heard who Peter Rollenhagen was before this incident.

The only other showing (besides hatred or intent to harm) upon which malice sufficient to defeat a Civil Code section 47, subdivision 3, privilege could have been inferred was lack of reasonable or probable cause on the part of CBS to believe in the truth of its publication. (*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 418 [42 Cal.Rptr. 449, 398 P.2d 785]; *Swaffield* v. *Universal Ecsco Corp.* (1969) 271 Cal.App.2d 147, 163-164 [76 Cal.Rptr. 680].) Lack of reasonable or probable cause in this context is not, however, a simple negligence concept. ■ As defined in the case, malice focuses upon the defendant's state of mind, not his conduct. Mere negligence in inquiry cannot constitute lack of reasonable or probable cause. (*Roemer* v. *Retail Credit Co.* (1970) 3 Cal.App.3d 368, 371 [83 Cal.Rptr. 540].) Plaintiff relies on *Widener* v. *Pacific Gas & Electric Co.* (1977) 75 Cal.App.3d 415 [142 Cal.Rptr. 304], and a line of cases cited therein for the proposition that failure to investigate thoroughly and verify facts equates with bad faith or malice. *Widener* really tells us, however, that a lack of inquiry and investigation *may* supply the sufficient inference of lack of good faith or negligence sufficient to supply the element of malice. "'[E]vidence of negligence, of motive and of intent may be adduced for the purpose of establishing, *by cumulation* and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity.'" (*Id.*, at p. 434, quoting *Goldwater* v. *Ginzburg* (2d Cir. 1969) 414 F.2d 324, 342.) In *Widener*, which reversed a trial court granting of judgment NOV, the Court of Appeal pointed out that there had been no effort by Pacific Gas and Electric to check the veracity of the charge that their engineer, by letter, leveled at plaintiff that plaintiff had dubbed into a video interview a statement made elsewhere. The court pointed out that the Pacific Gas and Electric executives who participated in the drafting of the letter "...had cause seriously to question the veracity of their sole source, Carroll....None of them (nor Carroll) had viewed the film, in which Carroll's words are clearly synchronized with his lip movements and he appears to be looking

directly at the camera....None [of them] checked into the technical feasibility of the charged tampering...none of them questioned Carroll about the charge...." (*Id.*, at p. 435.) In *Widener*, there was no "hot news" pressure on the publisher, for several months had gone by before the libelous publication was made. The court recognized that where the defamatory statement published does not involve an issue of "hot news" and the need for expeditious release is not present, the element of malice in the form of reckless disregard of whether the statement is true or not may be evidenced *in part* by failure to investigate thoroughly to verify the facts.

*Roemer, supra,* further discussed the point with the language: "'[O]rdinarily the privilege [Civ. Code, § 47, subd. 3] is lost if defendant had no reasonable grounds for believing his statements to be true.' But this is not to say that mere negligence in making 'a sufficient inquiry into the facts on which the statement was based' does, of itself, relinquish the privilege. 'Mere inadvertence or forgetfulness, or careless blundering, is no evidence of malice.' [¶] While '[t]he concept of negligence is inherent in the issue of probable cause, the decisions long ago recognized that to constitute malice the negligence must be such as 'evidenced a wanton and reckless disregard of the consequences and of the rights and of the feelings of others.' Recently a statement made with 'actual malice' has been defined as one made 'with knowledge that it was false or with a reckless disregard of whether it was false or not.' [¶] We are satisfied that mere negligence in investigation of the facts, in the sense of oversight or unintentional error, is not alone enough to constitute malice. It is only when the negligence amounts to a reckless or wanton disregard for the truth, so as to reasonably imply a wilful disregard for or avoidance of accuracy, that malice is shown." (3 Cal.App.3d at pp. 371-372; citations omitted.)

No matter how CBS was tipped off to the story, it appears without contradiction from the record that by the time it got to the locale and interviewed Elizabeth Mazur and Brown and Sirks it was told the very things that were later published. Elizabeth said then that she believed her factual statements; she testified in the trial that she believed them. The police reports furnished to CBS and Wiman contained the very factual matters which defendant CBS later published. Even at that, defendant CBS did not take the story at face value and publish without first getting plaintiff's version. Plaintiff did, in his interview statement to Wiman, admit that he had violated the law in that he had not given written estimates of work to be done. He did adamantly deny any

fraudulent practices and further challenged the statements of the police and state undercover men that the car he worked on was trouble free, and this was all reported in the story.

Although not cited by plaintiff, defendant CBS points out the latest case dealing with this area of privilege, *Rancho La Costa, Inc.* v. *Superior Court* (1980) 106 Cal.App.3d 646 [165 Cal.Rptr. 347]. Here, Penthouse International, Ltd. et al, real parties in interest, better known as Penthouse Magazine, published an expose type article accusing the owners of Rancho La Costa resort of being mobsters, gangsters, and members of organized crime. The case came to the Court of Appeal on an application by plaintiffs for a writ of mandate to compel the trial court to vacate its order of summary adjudication that plaintiffs were public figures and that defendants' publication was privileged under Civil Code section 47, subdivision 3. The Court of Appeal granted the writ, and disposed of the public figure aspect of the case handily, but then went on: "Apart from the claim of privilege concerning public figures which we have discussed above, defendants claim that their publication was privileged under Civil Code section 47(3). We reject the contention. The state conditional privilege of section 47(3) does not apply to a publication by a magazine or newspaper merely because it relates to a matter which may have general public interest. (*Newby* v. *Times-Mirror Co.* (1920) 46 Cal.App. 110 [188 P. 1008]; *Gilman* v. *McClatchy* (1896) 111 Cal. 606 [44 P. 241].)" (*Id.*, at p. 664.)

The Court of Appeal in *Rancho La Costa* scrutinizes the word "interested" used in Civil Code section 47, subdivision 3, and concludes that it refers to a more direct and immediate concern than, "mere general or idle curiosity of the general readership of newspapers and magazines." (*Id.*, at pp. 664-665.) After considering 4 Witkin, Summary of California Law (8th ed. 1974) Torts, sections 306-309, pages 2577-2580, and his analysis of these words, the court concludes: "The strictly limited statutory qualified privilege is inapplicable to a defamatory article published at large to a vast audience in a national magazine." (*Id.*, at p. 665.)

The Court of Appeal then considers a line of cases beginning with *Gilman* v. *McClatchy* (1896) 111 Cal. 606 [44 P. 241]; *Newby* v. *Times-Mirror Co.* (1920) 46 Cal.App. 110 [188 P. 1008]; and carrying forward through *Peoples* v. *Tautfest* (1969) 274 Cal.App.2d 630, 636-637 [79 Cal.Rptr. 478], to reach the conclusion that no media has the right to trifle with the reputation of any citizen. The court con-

cludes: "Plaintiffs as private individuals are entitled to the protection of their right of privacy. That right is entitled to redress when violated. Under the mandate of the recent federal Supreme Court rulings, the right of privacy is paramount to the right of free speech when in the exercise of free speech a defendant violates another's privacy by uttering a defamatory lie about him. The right of free speech guaranteed by the state and federal Constitutions does not permit violation of the right of privacy. It most surely follows that the privilege created by Civil Code section 47(3), a statute, and thus a law of lesser organic force, cannot be expanded to permit violation of that same right of privacy. Whatever privilege is accorded defendants under Civil Code section 47(3), it must yield to the plaintiff's constitutional rights of privacy." (*Id.*, at p. 667.)

The Court of Appeal considered, in reaching this conclusion, some of the cases we heretofore discussed such as *Snively* v. *Record Publishing Co., supra,* 185 Cal. 565; *Maidman* v. *Jewish Publications, supra,* 54 Cal.2d 643; *Williams* v. *Daily Review, Inc., supra,* 236 Cal.App.2d 405, but concluded that these cases "are distinguishable" in that they referred to public officials or the publication "was limited to a local or a special interest group and related to matters of special concern." (*Id.*, at pp. 666-667.)

■ About all that can be said in harmonizing *La Costa* with the result we reach is to point out that the definition of "interested" as scrutinized by the *La Costa* court is certainly broad enough to encompass the case at bench, for the arena of auto repair has been the subject of rather extensive legislative coverage in an attempt to protect the public from fraudulent and dishonest practices. (Bus. & Prof. Code, §§ 9880.1-9889.21.) The record shows that CBS in this area operated through its affiliate KNXT to broadcast this news locally in the southern California area. The cases which the *La Costa* court distinguishes from its applicability seem to readily encompass the case at bench. Furthermore, the *La Costa* decision limits itself in this area where it concludes: "We need not extend the discussion of the inapplicability of section 47(3) relative to the subject matter of the publication at bench, and who was interested therein, who was entitled to receive and who was entitled to disseminate it. Such discussion is made unnecessary because the only basis upon which defendants seek the benefit of the statute is by saying that the public at large, and hence that part thereof which constitutes its readership, is interested generally in the fight against organized crime. There being no specific evidence of any par-

ticular or specific subject matter of communication, no recital of the inadequacy of the evidence in the application of the section is necessary." (*Id.*, at p. 667.) The rationale of the case appears to be that a publisher should not be able to define the scope of the privilege by its own determination of what it chooses to publish and that the court should consider the relationship between the publisher and the reader and the legitimacy of the public interest in the subject matter of the article. To this extent we agree.

From all of the above, we conclude that the trial court analyzed the situation correctly from the standpoint of determining the applicability of the privilege under Civil Code section 47, subdivision 3.

The trial court, in granting the judgment NOV, stated that its basis was also Civil Code section 47, subdivision 4, which provides, a privileged publication or broadcast is one made: "4. By a fair and true report in a public journal, of (1) a judicial, (2) legislative, or (3) other public official proceeding, or (4) of anything said in the course thereof, or (5) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant shall have been issued."

The court, in support of its position, cited *Glenn v. Gibson* (1946) 75 Cal.App.2d 649 [171 P.2d 118], and *Hayward v. Watsonville Register-Pajaronian and Sun* (1968) 265 Cal.App.2d 255 [71 Cal.Rptr. 295]. The requirement that a report of a criminal proceeding be fair and true is satisfied if the report is substantially correct and produces no different effect on the viewer than an exact account of the proceeding. "Fair and true" as used in Civil Code section 47, subdivision 4, does not require the reporter to resolve the merits of the charges, nor does it require that he present the arrestee's version of the facts.

In *Glenn v. Gibson, supra,* 75 Cal.App.2d 649, the newspaper defendant was sued by the alleged operator of a house of ill repute. This after the paper had carried continuing accounts of plaintiff's arrest and prosecution. The lower court sustained a demurrer without leave to amend. The Court of Appeal affirmed and determined that the reports were privileged, notwithstanding plaintiff's complaints that the accounts contained oral statements of police officers about plaintiff's arrest before formal judicial proceedings took place, and the arrest accounts inferred plaintiff was guilty of a morals charge, when, in fact, after trial, plaintiff was only found guilty of operating a hotel without a li-

cense and was acquitted of operating a disorderly house. The Court of Appeal further noted that since the complaint disclosed the qualified privilege as a matter of law, the only determination left was the question of sufficient showing of factual allegations of malice in the complaint.

In *Hayward* v. *Watsonville Register - Pajaronian and Sun, supra,* 265 Cal.App.2d 255, defendant published a newspaper account of plaintiff's arrest for grand theft. Following plaintiff's acquittal, he sued claiming numerous inaccuracies and an imputation of guilt. The complaint was limited solely to allegedly false information obtained from the local police department file reports. The Court of Appeal affirmed a summary judgment for defendants. It compared the inaccuracies to the reports and concluded that the article was substantially in accord with the crime reports which were privileged under Civil Code section 47, subdivision 4. "Fair and true" is further defined in *Handelsman* v. *San Francisco Chronicle* (1970) 11 Cal.App.3d 381 [90 Cal.Rptr. 188]. There, defendant newspaper published an account of a civil lawsuit filed against the plaintiff which was "translated" by the writer, who characterized the allegation of civil conversion as "outright theft." The trial court submitted the case to the jury with a special verdict which had the question of whether the story was, "a substantially fair and true report." When the jury answered in the affirmative, the court entered judgment thereon. The Court of Appeal noted in that decision that in determining whether the report was fair and true, the article must be regarded from the standpoint of those persons whose function it is to give the public a fair report of what has taken place.

In the analysis of these cases, the trial court in effect stated that as a matter of law the privilege issue is or should have been resolved by the court. This appears to be correct procedure and is so stated in *Williams* v. *Daily Review Inc., supra,* 236 Cal.App.2d 405, and reaffirmed in *Handelsman* v. *San Francisco Chronicle, supra.* The only possible jury issues then remaining were "fair report" and/or a question of malice. Had there been *any* evidence of lack of fair report or of malice on the part of these defendants, the court might well have, and correctly should have, let it go to the jury on proper instructions. The court carefully reviewed the record and determined that the "collateral matters and asserted lies" presented by plaintiff were substantially accurate reports of the police proceedings against plaintiff. The trial court further stated, "We also find as a matter of law that there is no evidence whatsoever of malice in this case on the part of either defendant

whether we use the term 'malice' in the constitutional sense applied by the United States Supreme Court in *Gertz* or as defined in the Civil Code 48(a)4.... Accordingly, for the reasons hereinabove stated and particularly in the complete absence of any proof of malice in any sense, the motion for judgment NOV is granted." Plaintiff does in fact point to no factual record to substantiate a finding of lack of fair and true report or possible finding of malice. A review of the entire record by this court leads us to the same conclusion.

We do, therefore, hold that the action of the trial court in granting the judgment NOV was correct.

In view of our holding above, it is not necessary to discuss the trial court's decision and basis therefor for the conditional grant of a new trial, or defendants' contention of no competent evidence of plaintiff suffering actual damage.

Judgment is affirmed.

Tamura, Acting P. J., and McDaniel, J., concurred.

APPENDIX

BIG NEWS—October 19, 1973

Wiman: What would you do if you had over a hundred dollars in repairs to your Volkswagen ... and then within two weeks the same garage told you, you needed $500 dollars MORE repair work?

That's what happened to 23 year old teacher's assistant Elizabeth Mazur. She went to see the City of Orange Police Department to complain ... because in two weeks she spent more money in repairs than her 1965 Volkswagen was worth:

Mazur: "Here I am a victim ... I really felt like I'd been taken advantage of so I went ... I felt like I had to report this because everything is just falling apart when this happens, so I went to the police and they handled it and they are investigating it at the consumer ... and I hope they are going to fix this man because I don't know how many other people have been in my spot."

Wiman: City of Orange Detective Trey Sirks teamed with an investigator from the State Bureau of Automotive Repair. They took a City-owned Volkswagen, had the city mechanic make sure it was in good running order ... then purposely broke a spark plug. Then they took that VW to the same garage Miss Mazur complained about. Last Wednesday afternoon when they went to pick it up they ... were presented with a bill for work totaling ... 159 dollars and 31 cents.... But the garage owner had failed to comply with the State Law ... he did not give a written estimate of costs... He made the repairs without consent of the owner ... After paying the bill the detective and state investigator identified themselves and placed the garageman under arrest. This VW was towed back to the City garage where it was torn down. According to the City mechanic ... all kinds of new parts had been installed ... but none of the old parts were defective ... none needed re-placing....

This afternoon ... the garage owner, Peter Rollenhagen, told me he DID fail to comply with the State Law about the estimate... But he claims the work on the car was needed ... and that he's just trying to make an honest living:

Rollenhagen: "Well when he came in the morning he complained about a jerking of the car. Now, I drove it, it was jerking because the clutch had oil on it and it was shattering. Now, later on he told me I didn't say it was shattering. I said ... he said he told me it was jerking see ... now, as for me as a mechanic, I have to interpret what he says and to the best of my knowledge this is how I interpret."

Wiman: "But, you did not give him an estimate at the time he brought the car in, and you never got his permission to make all of these other repairs that you made on the car?"

Rollenhagen: "Well, he said he wants it fixed and as far as I understood he asked me to go ahead and do it."

Wiman: Rollenhagen now prominently displays a State Sign which is required in all licensed garages.... He said until now it's been in the back room....

And now he gives written estimates to ALL his customers ... he'll get a chance to tell his side of the story to the judge when he goes to court next Friday ... and to the State Division of Automotive Repairs ... which is also looking into this case.